UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


RUTHIE R. ROBERTSON,

    Plaintiff,      Case No.  07-12027

v.           District Judge George Caram Steeh
            Magistrate Judge R.  Steven Whalen

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.
_____/

## **REPORT AND RECOMMENDATION**

   Plaintiff Ruthie Robertson, proceeding *pro se*, brings this action under 42 U.S.C.

§405(g) challenging a final decision of Defendant Commissioner denying her application for

Disability Insurance Benefits under the Social Security Act.  Both parties have filed summary

judgment motions which have been referred for a Report and Recommendation pursuant to

28 U.S.C. §636(b)(1)(B).  For the reasons that follow,  I recommend that Defendant's motion

be DENIED.   Plaintiff's motion requesting a reversal for benefits should DENIED, but to

the extent it is construed to also request a remand for further fact-finding, it should be

GRANTED for the limited purpose of requiring the ALJ to  either adopt her treating

physician's December, 2003 finding or give "good reasons" for rejecting it.  *Wilson v.*

*Commissioner of Social Sec.* 378 F.3d 541, 544  (6th Cir. 2004)

-1-

## PROCEDURAL HISTORY

On June 6, 1999, Plaintiff filed an application for Disability Insurance Benefits ("DIB"), alleging an onset date of April 2, 1999[1] (Tr. 47, 49). After the initial denial of her claim, she made a timely request for an administrative hearing, held on April 2, 2002 in Flint, Michigan (Tr. 411). Administrative Law Judge ("ALJ") Douglas N. Jones presided (Tr. 411). Plaintiff, unrepresented, testified (Tr. 417-441) as did Vocational Expert ("VE") Pauline McEachin (Tr. 439-446). On April 24, 2002, ALJ Jones determined that Plaintiff was not disabled (Tr. 245). On September 10, 2003, the Appeals Council vacated the decision, finding that the ALJ failed to provide a "function-by-function analysis of the claimant's capabilities," including "how long the claimant can sit or stand before having to change positions" (Tr. 256). The Council, also finding that the medical evidence "had not been updated for a significant period of time," directed the ALJ to obtain updated records (Tr. 256-257). The Council stated further that "[i]f the additional evidence does not clearly depict the claimant's limitations," the ALJ would be required to order a consultive examination (Tr. 257).

On June 8, 2004 ALJ Jones conducted a second hearing at which Plaintiff, then represented by Elizabeth Eddins, testified (Tr. 453-476). VE Judith Findora also testified (Tr. 476-484). On January 6, 2005, ALJ Jones again found that Plaintiff was not disabled (Tr. 26). On March 8, 2007, the Appeals Council denied review (Tr. 7-9). Plaintiff filed for

---

[1]Plaintiff alleges that as of April, 1997 her condition obliged her to work only part-time (Tr. 56).

judicial review on May 8, 2007.

**BACKGROUND FACTS**

Plaintiff, 43 at the time of the January 6, 2005 decision, completed 12th grade and worked previously as a medical billing clerk (57, 62). She alleges disability as a result of sarcoidosis (Tr. 56).

### A.    Plaintiff's Testimony

### 1. April 2, 2002 Hearing

Plaintiff testified that she lived with her mother, niece, and a great niece in Ypsilanti, Michigan (Tr. 417). She reported that she had obtained one semester of clerical training in addition to her high school diploma (Tr. 418). Plaintiff stated that she last worked as a medical billing clerk at the University of Michigan Hospital (Tr. 419). She testified that she stopped working after falling asleep repeatedly during her shift (Tr. 425).

Plaintiff reported that she drove on multiple occasions each week, alleging that she experienced discomfort sitting in a car seat as a result of arthritis (Tr. 420). She testified that she experienced the arthritis-related condition of sarcoidosis which created infections in her "vital organs," lungs, eyes, and liver (Tr. 421). She added that steroids had controlled liver problems but did not relieve breathing problems, which were exacerbated by hot weather (Tr. 421-422). Along with her primary and pulmonary care, Plaintiff reported that she received treatment from a rheumatologist (Tr. 423). Plaintiff, noting that the medical records submitted had not been updated since 2000, stated that she continued to receive treatment (Tr. 423-424).

Plaintiff, reporting that her billing clerk job required her to sit for an entire shift, alleged that she was unable to sit for more than four hours at a time due to hip pain and leg swelling, but denied right leg or foot limitations (Tr. 426, 430). She indicated that after stopping full-time work she attempted to work half-time, but was hindered by sleepiness and her need to change positions (Tr. 427-428). She admitted that contrary to her doctor's advice, she had discontinued steroid use, testifying that weight gain as a result of steroid use had placed additional pressure on her hip and knees (Tr. 429). Plaintiff reported that she had also received Methotrexate in the past, but was currently taking only Imuran (Tr. 431). She denied that her sarcoidosis was currently in remission (Tr. 430).

Plaintiff testified that she currently used her home computer, watched television, and prepared simple meals on a regular basis (Tr. 431-433). She indicated that she considered going back to school, attributing her continued health problems to environmental problems at her work place (Tr. 434-435). She denied being able to lift more than 15 pounds due to lumbar back, hip, and knee problems (Tr. 436-437). Plaintiff stated that she could provide updated records for review by the ALJ within two weeks (Tr. 438).

## 2. June 8, 2004 Hearing

Plaintiff testified that she continued to live in Ypsilanti, Michigan (Tr. 453). She estimated that she drove four times a week (Tr. 455). She denied leaving the state, but indicated that she had vacationed "up north" (Tr. 455). She reported receiving long-term disability benefits from her former employer (Tr. 455). She testified that she currently received primary care from Dr. Johnson, as well as treatment by a rheumatologist and

cardiologist (Tr. 455-456).  She reported that she had avoided taking medication prescribed for arthritis and high blood pressure due to the respective side effects of stomach upset and frequent urination, stating that she was currently taking lisinopril which successfully lowered her blood pressure (Tr. 457-460, 468-469).  Plaintiff acknowledged that she had been advised to lose 60 pounds and exercise two months before the hearing, but had since taken a walk only once, adding that her exercise bike was broken (Tr. 461).  She testified that her condition had recently improved, but that prior to her recent improvement her heart condition disabled her intermittently for days at a time (Tr. 464-465).  She reported that since the improvement of her lung condition, she drove on a regular basis to the grocery store, but often required hour rest periods over the course of each day (Tr. 467, 469).  She stated that her hip condition remained the same (Tr. 470).  She denied drinking alcohol in the last five years (Tr. 461).  Despite her acknowledgment of recent improvement, Plaintiff alleged that symptoms of various conditions would preclude work five to seven days each month (Tr. 471-472).

### B.     Medical Evidence

### 1.  Treating Sources

An April, 1998 examination by Mary M. Johnson, M.D. found a normal blood pressure reading and clear lungs (Tr. 198).  The following month, Michael J. Coffey, M.D., noting that Plaintiff was exercising and demonstrated improved lung function, concluded that she was "doing well on methotrexate therapy" (Tr. 195).  In July, 1998, Dr. Johnson noted that despite Plaintiff's complaint of hip pain, imaging studies were unremarkable (Tr. 188).

The following month, Dr. Coffey noted that Plaintiff continued to adhere to a weight loss program by exercising regularly (Tr. 183). In November, 1998, Plaintiff complained again of hip pain, but denied that sarcoidosis had affected her vision (Tr. 191). The same month, rheumatologist Robert W. Ike, M.D. observed that "[n]either x-rays nor bone scan could confirm any abnormalities" of the hip joint (Tr. 177). In January, 1999, Dr. Ike, noting joint inflammation, recommended an increase of Methotrexate to 25 mg. a week (Tr. 171). The following month, Marc Jacobs, M.D., finding that Plaintiff failed to respond to high doses of Methotrexate, recommended steroid treatments (Tr. 166). In March, 1999, Plaintiff refused the recommended steroid treatment (Tr. 164). Nonetheless, Dr. Coffey noted a slight improvement in her condition (Tr. 164). In May, 1999, Dr. Coffey prescribed Imuran (Tr. 160). June, 1999, treating notes by Dr. Coffey indicate that Plaintiff tolerated Imuran, finding further in August, 1999 that Plaintiff was "doing well" (Tr. 146, 153). In February, 2000, sleep apnea testing showed "very poor sleep efficiency" (Tr. 142). In May, 2000, Dr. Coffey prescribed Prednisone after observing that Plaintiff experienced increased shortness of breath (Tr. 138). In February 21, 2002, Dr. Coffey observed that Plaintiff's condition was "reasonably good" and that she had been taking care of her mother since October, 2001 (Tr. 292). Notes from an annual exam the following month indicate that Plaintiff continued to exercise, although she was occasionally limited by right hip pain (Tr. 290). In May, 2002, Dr. Ike, noting that Plaintiff was beginning a more aggressive exercise program, noted that he did not "believe her current level of complaints require[d] ongoing rheumatology input" (Tr. 288-289). In August, 2002, Dr. Coffey found that Plaintiff's respiratory symptoms were

stable (Tr. 286). In February, 2003, Dr. Coffey prescribed Zestril after noting Plaintiff's diagnosis of hypertension (Tr. 284). In June, 2003, Dr. Coffey found that Plaintiff was doing "reasonably well" (Tr. 282). In October, 2003, he noted that Plaintiff again experienced elevated blood pressure readings as well as a "slightly elevated" creatinine level (Tr. 343). In December, 2003 Plaintiff was admitted to the hospital for hypertension, where evidence of left ventricular hypertrophy was discovered (Tr. 378, 381). Imaging studies of Plaintiff's head, brain, and chest showed no abnormality (Tr. 370).

The same month, Dr. Coffey completed an assessment of Plaintiff's functional limitations (Tr. 349). He found the presence of a sleep disorder causing "excessive daytime sleepiness" and obesity, finding further that Plaintiff's sleepiness would "often" interfere with her ability to concentrate (Tr. 351). He opined further that Plaintiff's depression contributed to the severity of her symptoms (Tr. 352). Although he determined that Plaintiff's ability to stand or walk was affected, he found she could sit with limitation (Tr. 353). Dr. Coffey also found that Plaintiff would not require position changes or a sit/stand option (Tr. 353). He found that Plaintiff was limited to occasional climbing, balancing, crouching, crawling, pulling, feeling, temperature extremes, noise, humidity, and vibration (Tr. 354-355). Dr. Coffey found that Plaintiff should avoid chemicals, dust, and fumes (Tr. 355). He estimated that Plaintiff's conditions would prevent her from working twice a month (Tr. 355). In April, 2004, Kenneth A. Jamerson, M.D., noting that Plaintiff's symptoms were largely attributable to obesity and lack of exercise, referred her to a nutritionist (Tr. 278-279). In May, 2004, Plaintiff denied shortness of breath (Tr. 386). The same month, Dr. Coffey

noted that Plaintiff's "sarcoidosis appears to be clinically stable at present" (Tr. 374).

## 2. Consultive and Non-examining Sources

In September, 1999 Karl J. Edelmann, M.D. examined Plaintiff on behalf of the SSA (Tr. 114). Dr. Edelmann, acknowledging a diagnosis of sarcoidosis, noted that Plaintiff had been treated with Prednisone, Methotrexate, and Imuran (Tr. 114). Dr. Edelmann noted elevated blood pressure readings but found "no evidence of shortness of breath or cough" (Tr. 115). The same month, a Physical Residual Functional Capacity Assessment found that Plaintff could lift 50 pounds occasionally; 25 pounds frequently; and stand, walk, or sit for six hours in an eight-hour workday (Tr. 122). The assessment also found the absence of pushing, pulling, postural, manipulative, visual or communicative limitations, but determined that Plaintiff should avoid concentrated exposure to extreme cold or heat and avoid even moderate exposure to fumes, odors, dust, gases, and poor ventilation (Tr. 122-125). The assessment concluded that Plaintiff's claims of limitation were "exaggerat[ed] in light of medical findings" showing that Plaintiff's respiratory and hip problems had improved (Tr. 126-127). An April, 2000 Psychiatric Review Technique found Plaintiff's affective disorder (depression) non-severe, finding the absence of functional limitations (Tr. 129).

In May, 2000, Dr. Levine, D.O. examined Plaintiff on behalf of the SSA (Tr. 200). Noting a diagnosis of sarcoidosis, Dr. Levine observed that Plaintiff experienced hip, knee, and back pain as well as breathing problems (Tr. 200). Plaintiff reported that although steroids improved her breathing, she experienced the side effect of significant weight gain (Tr. 200). Dr. Levine detected only a "minimal decreased range of motion," concluding that

Plaintiff was able to perform "age appropriate activities" (Tr. 202).   A Residual Functional

Capacity Assessment performed the following month found that Plaintiff retained the ability

to lift a maximum of ten pounds; stand or walk for two hours and sit for six in the course of

a workday with an unlimited ability to push or pull (Tr. 215).     Plaintiff was limited to

occasional climbing, balancing, stooping kneeling, crouching, and crawling (Tr. 216).   The

Assessment found the absence of manipulative, visual, or communicative limitations, but

found that she should avoid concentrated exposure to temperature extremes, wetness,

humidity, fumes, odors, dusts, gases, and poor ventilation (Tr. 217-218).   The Assessment

concluded by stating that "[t]he evidence establishes the presence of an impairment capable

of causing the symptoms [Plaintiff] alleges" (Tr. 219).

### C.   Vocational Expert Testimony
#### 1.  April 2, 2002 Hearing

VE Pauline McEachin classified Plaintiff's past relevant work as an office clerk as

semi-skilled at the sedentary level of exertion and the other semi-skilled clerical positions

as exertionally light[2] (Tr. 111).  The VE stated that her testimony would be consistent with

the Dictionary of Occupational Titles ("DOT") (Tr. 440).

The ALJ then posed the following question to the VE:

---

[2]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds
at a time and occasionally lifting or carrying articles like docket files, ledgers, and small
tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or
carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50
pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and
that exertionally *heavy*  work "involves lifting no more than 100 pounds at a time with
frequent lifting or carrying of objects weighing up to 50 pounds.

"If I were to ask you to assume a hypothetical person with the claimant's age and education and work experience was able to perform only sedentary work with a sit and stand option that was performed in a controlled environment and it had to be air conditioned and there'd be no dust, no fumes, no temperature extremes, would there be work that such a person can do?"

(Tr. 441). The VE found that the individual could perform Plaintiff's past relevant clerical work with a sit/stand option (Tr. 442). She testified that if the hypothetical limitations were to include a preclusion on repetitive wrist movement and forceful or sustained gripping or grasping, that the individual could still perform a significant range of clerical positions (Tr. 442).

### 2. June 8, 2004 Hearing

VE Judith Findora classified Plaintiff's past relevant work both as a medical billing clerk and general clerical work as semi-skilled at the sedentary level of exertion (Tr. 275). She stated that her testimony was consistent with the information found in DOT (Tr. 477).

The ALJ posed the following question:

"If I were to ask you to assume the hypothetical individual of the claimant's age, and she's currently 42-years-old, and education which includes a high [school] diploma and the work experience that you've indicated in [Tr. 275] who is able to perform only sedentary work that involved only occasional bending at the knees, occasional bending at the waist, occasional kneeling, occasional crawling, occasionally climbing of stairs and no climbing of ladders and no exposure to unprotected heights or hazardous, intrinsically hazardous uncovered moving machinery, only occasional overhead reaching with either arm, no use of vibrating tools, no exposure to dust, fumes or other airborne pollutants without the ability to use a respirator, preferably work in a controlled air environment. A clean in-air invironment. Only occasional exposure to very hot or very cold temperatures, only occasional exposure to very humid or very wet working environments, would such a person be able to perform any of the claimant's past jobs as she actually performed them or as they generally exist in the national economy?"

(Tr. 477). The VE replied that given the above limitations, Plaintiff could perform her past relevant jobs as a medical billing clerk and general office clerk as "she actually performed them" and "as they generally exist in the national economy" (Tr. 477). In addition, she found that skills from either job were transferrable to the positions of receptionist (17,400 existing in the regional economy), accounts clerk (14,100), and cashier (16,000) (Tr. 478). The VE found that the above limitations also allowed Plaintiff to perform the unskilled work of a general office clerk (11,100), accounting and auditing clerk (12,000), and unskilled cashier (12,000) (Tr. 478).

The VE testified that if the hypothetical limitations included only occasional exposure to loud noises, the unskilled cashier position would be reduced to 10,000 jobs (Tr. 479). The VE noted that if the limitations were amended to include a sit/stand option, the semi-skilled position of account clerk and unskilled work of accounting and auditing clerk would be eliminated (Tr. 480). The VE testified that in addition to the DOT, she relied on the Occupational Outlook Handbook in determining the job statistics (Tr. 482). She stated if Plaintiff were typically unable to work eight hours out of a 40 hour week, all of the above jobs would be precluded (Tr. 481).

**D.     The ALJ's Decisions**
**1.  April 24, 2002 Decision**
ALJ Jones found that Plaintiff experienced the severe impairments of sarcoidosis, hypertension, and left ventricular hypertrophy, but that none of these

conditions, either individually or in combination, equaled one of the listings listed in Appendix 1, Subpart P, Regulation No. 4 (Tr. 242). The ALJ determined that Plaintiff retained the Residual Functional Capacity ("RFC") to perform "sedentary work that permits sitting or standing at the employee's option, provides . . . for a sit/stand option, an air conditioned, dust free and fume free environment without temperature extremes, and involves no kneeling, crawling, or climbing of stairs or ladders" (Tr. 243). The ALJ found that despite these limitations, Plaintiff could perform her past relevant work as general office clerk as performed "in the national and regional economies" (Tr. 244). Finding Plaintiff's allegations of disability "not totally credible," he supported his non-disability determination by noting that Plaintiff continued to drive, shop, use her home computer, and perform housekeeping chores (Tr. 243).

### 2. January 6, 2005 Decision

Citing Plaintiff's medical records, ALJ Jones found the presence of sarcoidosis, essential hypertension, obesity, borderline left ventricular hypertrophy, lumbar strain, mild sleep apnea, possible renal insufficiency, and a depressive disorder, noting that while these conditions were severe at Step Two of his analysis, none of them, either individually or in combination, equaled one of the listings listed in Appendix 1, Subpart P, Regulation No. 4 (Tr. 22, 25). The ALJ noted that Plaintiff's various conditions were either stable or improving, finding that she retained the RFC for sedentary work

"that requires no climbing of ladders; no exposure to unprotected heights or hazardous machinery; no use of vibrating hand tools; no exposure to wetness or high humidity; no exposure to dust, fumes, or other airborne pollutants; no exposure to very loud noise; and no exposure to very hot or cold temperatures as well as no more than occasional stooping; crouching; kneeling; crawling; climbing stairs; reaching overhead with either arm; or constant, repetitive wrist movements"

(Tr. 24, 26). The ALJ again found that Plaintiff could perform her past relevant work as a general office clerk and medical billing clerk either as "previously performed" or "as generally performed in the national economy" (Tr. 25, 26). He supported his determination with recent medical findings indicating that Plaintiff's sarcoidosis was stable (Tr. 24). He also noted Plaintiff's lack of aggressive medical treatment, daily activities, and her "failure to follow prescribed treatment" undermined her allegations of disability (Tr. 24).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherill v. Secretary of Health and Human Services*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less than a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that

there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

### FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five to demonstrate

that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984).

## ANALYSIS

Because Plaintiff is currently unrepresented, her arguments for a remand for benefits are liberally construed.  First, she contends that the ultimate non-disability determination contradicts the ALJ's Step Two findings of the severe impairments of sarcoidosis, essential hypertension, obesity, borderline left ventricular hypertrophy, lumbar strain, mild sleep apnea, possible renal insufficiency, and a depressive disorder (Tr. 22).  Second, she argues that the ALJ performed a cursory and result-oriented hearing.  The Court will also address Plaintiff's January 28, 2005 submission to the Appeals Council alleging that the ALJ failed to address Dr. Coffey's December, 2003 opinion that symptoms of Plaintiff's various conditions would preclude work at least twice a month (Tr. 12, 355).

### A.  Step Two Findings

Plaintiff argues in effect that the ALJ's Step Two finding that she experienced the severe impairments of sarcoidosis, essential hypertension, obesity, borderline left ventricular hypertrophy, lumbar strain, mild sleep apnea, possible renal insufficiency, and a depressive disorder stands at odds with the ultimate determination that she was non-disabled.

The ALJ's finding that the above conditions were "severe," by itself, does not guarantee a disability finding. As discussed above, at Step Two of the administrative analysis, the finding that a condition is "severe," does not mean that a claimant is disabled as a result, but simply acknowledges that the condition could create "significant" workplace limitations. 20 CFR § 416.921(a). *Mowery v. Heckler,* 771 F.2d 966, 972, FN2 (6th Cir. 1985), notes that "Webster's Third New International Dictionary (1976) defines 'significant'" as "'having or likely to have influence or effect: deserving to be considered.'"

Here, the ALJ adequately discussed his reasons for finding that Plaintiff's severe impairments did not create disability. He noted that pulmonary function tests conducted between December, 2000 and June, 2003 showed at one point (April, 2001) moderately severely reduced readings, but also included tests showing only moderate and mild limitations (Tr. 20). He also cited a September, 2000 report that Plaintiff's hypertension was well controlled by Norvasc and Dyazide, noting that sleep study findings failed to show that the symptoms of sleep apnea were disabling (Tr. 20). The ALJ observed that Plaintiff's hypertension was controlled during her December, 2003 admission with already prescribed medication (Tr. 21).

Although Plaintiff states correctly that it is her "right" not to take her medication, the ALJ permissibly found that her her failure to take blood pressure medication undermined her claims of disability (Tr. 21). *Casey v. Secretary of Health and Human Services,* 987 F.2d 1230, 1234 (6th Cir. 1993). Likewise, although the

ALJ found that "borderline left ventricular hypertrophy" was a "severe" impairment, he noted that diagnostic testing showed a low likelihood for "significant coronary artery disease" (Tr. 22). Despite his finding that Plaintiff experienced the severe impairment of depression, he cited an April, 2000 Psychiatric Review Technique which found either mild or non-existent psychiatric limitations, noting as well that although Plaintiff alleged depression that she had recieve[d] "no psychological or psychiatric care"[3] (Tr. 23). Because substantial evidence, thoroughly discussed by the ALJ, supports his finding that Plaintiff's conditions did not create disability, reversal is inappropriate.

## B. A Full and Fair Hearing

Plaintiff also states that ALJ Jones "doesn't know my condition nor does he care," implying that he conducted only a perfunctory assessment of her case. *Plaintiff's Brief*, *Docket #12.* She contends that the ALJ "made a decision before I even left." *Id.*

Although an ALJ cannot properly assume the role of counsel, "[h]e acts as an examiner charged with developing the facts." *Lashley v. Secretary of Health and Human Services* 708 F.2d 1048, 1051 (C.A.Tenn.,1983); *Richardson v. Perales,* 402

---

[3]

Although Dr. Coffey found in December, 2003 that depression would impact Plaintiff's capacity for work, he did not specify to what extent she was limited by depression (Tr. 352). The ALJ's finding of minimal limitations is therefore not inconsistent with the treating physician's opinion.

U.S. 389, 411 91 S.Ct. 1420, 1432, 28 L.Ed.2d 842 (1971). Here, a review of the June, 2004 transcript shows that ALJ Jones conducted a procedurally and substantively adequate inquiry into Plaintiff's condition (Tr. 453-476). Although "where the claimant is unrepresented by counsel, the ALJ has a duty to exercise a heightened level of care and assume a more active role" in the proceedings, because Plaintiff, now *pro se*, was in fact represented by counsel at the latest hearing, no such heightened duty existed. *Id.; Smith v. Harris,* 644 F.2d 985, 989 (3d Cir.1981). I disagree with Plaintiff's related contention that the ALJ used valuable hearing time to make a speech. While the sworn testimony is prefaced by the ALJ's explanation of the hearing process and his discussion with counsel, almost 23 transcript pages are devoted to exclusively to Plaintiff's testimony.

Further, neither the hearing transcript nor the administrative decision supports Plaintiff's claims of bias. While "[t]he right to a trial by an impartial decision maker is a basic requirement of due process," (*In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955)), the courts do not lightly conclude that a judicial bias claim has been established. *United States v. Microsoft Corp.,* 56 F.3d 1448, 1463 (D.C.Cir.1995). The presumption that the judicial officer is unbiased can be rebutted by showing that the he "displayed deep-seated and unequivocal antagonism that would render fair judgment impossible;" however even "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women ... sometimes display" do not establish bias. *Liteky v.*

*United States,* 510 U.S. 540, 555-556, 114 S.Ct. 1147, 1157, 127 L.Ed.2d 474 (1994).

Even assuming for the sake of argument that the ALJ actually showed signs of boredom, impatience, or disinterest, nothing in the record suggests that the administrative process was tainted by bias.

## C.  The Treating Physician Analysis

Finally, Plaintiff's application for Appeals Council review contends that the ALJ failed to address Dr. Coffey's December, 2003 opinion that Plaintiff's conditions would oblige her to miss at least two workdays each month (Tr. 12 *citing to* 355). Because at least this portion of Dr. Coffey's findings suggest disability level impairment, the ALJ was required consider this opinion.

> "[i]f the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors--namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source--in determining what weight to give the opinion."

*Wilson v. Commissioner of Social Sec.* 378 F.3d 541, 544  (6th Cir. 2004).

Although the treating physician's rule set forth in *Wilson* refers primarily to an express rejection of a treating physician's opinion, here, the ALJ appeared to concur with the physician's findings by actually stated that the ultimate RFC was "consistent" with Dr. Coffey's December, 2003 findings (Tr. 24).  However, the administrative opinion is absent any mention of treating physician's finding that Plaintiff's condition would cause her to miss

work "about twice a month" (Tr. 355). As noted by the VE, "employers will accept no more than one unexcused absence per month" (Tr. 481). Dr. Coffey's finding that Plaintiff would miss work "about twice a month," by itself, states disability level limitations. While not stated as such, the ALJ's non-disability finding was an implicit rejection of Dr. Coffey's "twice a month" finding. While as noted by the ALJ, substantial evidence found elsewhere in record supports his determination, pursuant to *Wilson* at 544 (*citing Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir.1999), his failure to give "good reasons" for rejecting Dr. Coffey's "about twice a month" finding constitutes reversible error:

> "'The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases,' particularly in situations where a claimant knows that his physician has deemed him disabled and therefore 'might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'"

*Id.* Because the ALJ's failure to discuss or even acknowledge Dr. Coffey's critical finding deprives Plaintiff of "an important procedural safeguard,"a remand is required. *Wilson,* at 547; 20 C.F.R. §404.1527(d)(2). However, because proof of disability is far from "overwhelming," the neglect of even critical evidence does not automatically entitle Plaintiff to an award of benefits. *Faucher v. Secretary of Health and Human Services*, 17 F.3d 171, 176 (6th Cir. 1994). Further, a remand for additional testimony is unnecessary since ALJ Jones has already conducted two lengthy hearings on this matter and the latest administrative decision is otherwise without material error. Therefore, a remand should be granted for the narrow

purpose of requiring the ALJ to either adopt Dr. Coffey's finding or give "good reasons" for rejecting it.

## IV. CONCLUSION

For these reasons, I recommend that Defendant's motion be DENIED. Plaintiff's motion for a reversal for benefits should DENIED, but to the extent it is construed to also request a remand it should be GRANTED for the limited purpose of requiring the ALJ to either adopt Dr. Coffey's finding or give "good reasons" for rejecting it.[4]

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge. Within ten (10) days of service of any objecting party's timely filed objections, the opposing

---

[4] If the ALJ adopts Dr. Coffey's finding, he must, of course, revisit his ultimate disability determination in light of that finding.

party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: May 21, 2008


CERTIFICATE OF SERVICE


The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on May 21, 2008.


s/Susan Jefferson
Case Manager